MESSAGEPHONE, INC.; MPI Pass–Through Annuity Collateral Trust; and Donovan M. Campbell, M.D., Appellants,

v.

TEXAS LIFE, ACCIDENT, HEALTH & HOSPITAL SERVICE INSURANCE GUARANTY ASSOCIATION, Appellee.

No. 03–97–00210–CV.

Court of Appeals of Texas, Austin.

March 26, 1998.

David C. Duggins, Clark, Thomas & Winters, Austin, for Appellants.

Camille Johnson Mauldin, Hohmann, Werner & Taube, L.L.P., Austin, for Appellee.

Before POWERS, ABOUSSIE and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

To address certain issues raised in the motion for rehearing we withdraw our earlier opinion and judgment issued February 26, 1998, and substitute this one in its place.

At issue is whether certain unallocated annuities are covered under the Texas Life, Accident, Health and Hospital Service Guaranty Act.[1] The annuity contracts were issued by American Equitable Life Insurance Company to Messagephone, Inc. and later assigned to MPI Pass–Through Annuity Collat-

---

1. There are two versions of the Guaranty Act involved in this case. For general reference we will refer to it as the "Act." With regard to a more particularized discussion we refer to it either as the "1987 Act" or the "1991 Act." *See*  Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 38, 1987 Tex. Gen. Laws 3610, 3661; Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 1.21, 1991 Tex. Gen. Laws 252, 283 (effective January 1, 1992).

eral Trust and Donovan Campbell. After the insurance company declared insolvency, appellants sought coverage on the contracts from appellee, the Texas Life, Accident, Health & Hospital Service Insurance Guaranty Association (the "Association"), which denied the claims. Appellants then sued the Association. The trial court denied appellants' motion and granted appellee's motion for summary judgment. In two points of error, appellants claim the trial court erred in finding as a matter of law that their claims are not covered under the Act. We will affirm the trial court's judgment.

## BACKGROUND

### The Nature of Unallocated Annuity Contracts

The instant case involves guaranteed interest contracts (GICs) purchased as "unallocated group annuity contract[s]." GICs have recently become a popular investment vehicle for employee benefit plans, such as qualified retirement plans, and for this purpose are purchased as unallocated annuities by plan managers because they provide a guaranteed rate of interest and a relatively risk-free return of the principal at the end of the term. See Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n, 110 F.3d 547, 549 (8th Cir.), cert. denied, —— U.S. ——, 118 S.Ct. 156, 139 L.Ed.2d 102 (1997); Unisys Corp. v. Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n, 943 S.W.2d 133, 138 (Tex.App.—Austin 1997, writ denied); see generally Practicing Law Institute, Legal Issues in Pension Investment (1981) (including article on guaranteed investment contracts). Generally, unallocated annuity contracts are issued to the qualified retirement plan manager in trust for the employee plan so that employee contributions are managed by the trustee on behalf of plan participants. E.g. Honeywell, Inc., 110 F.3d at 549; Unisys Corp., 943 S.W.2d at 135. In addition to a guaranteed return, an unallocated annuity contract provides the option for an eligible plan participant to purchase an individual annuity at a guaranteed rate incorporating standard mortality tables. When an individual exercises her option to purchase an annuity that contract is then "allocated" to that participant; the guaranteed interest contract issued to the plan manager remains an unallocated group annuity contract.

### The Nature of the Guaranty Association

The Guaranty Act established the Association to protect persons against failure in the performance of contractual obligations under certain forms of group and individual life, accident, and health insurance policies and annuity contracts should the issuing insurance company become insolvent. Tex. Ins. Code Ann. art. 21.28–D, §§ 2, 6 (West Supp. 1998). Holders of contracts or policies issued by an insolvent insurer and covered under the Act may be entitled to coverage from the Association. Id. § 3.

### A History of these Transactions

In the spring of 1989 Messagephone purchased three contracts from American Equitable. It paid for each of the contracts by issuing to the insurance company unrestricted shares of Messagephone's common stock. American Equitable called each contract an unallocated group annuity, defined as an "accumulation of deposits at interest with right to purchase annuity at guaranteed rates." Although the insurance company called the three Messagephone contracts unallocated group annuities, they differed from the standard guaranteed investment contract in two significant ways: (1) there was no initial cash deposit which the insurance company could invest at presumably higher rates than it was paying on the contract (the purchase price being stock rather than cash); and (2) the contracts were issued to a corporation rather than to a qualified employee benefit plan. It is hard to imagine how the three contracts made economic sense to American Equitable without an initial cash deposit; in order to generate any benefit for itself the insurance company had to presume an increase in the value and marketability of Messagephone's stock that exceeded the interest it promised to pay for five years. Normally, an insurance company relies on its own ability to wisely invest the cash deposit in order to generate benefits beyond the interest payments. On their face the contracts appeared to be risk free to Messagephone, as long as the insurance company maintained financial

integrity, or its obligations were backed by the Association. Significantly, American Equitable was experiencing financial difficulties at the same time or soon after it issued these hybrid contracts to Messagephone. More significantly, the purchase of the three annuity contracts was part of a contemporaneous series of financial transactions by Messagephone that we will now outline.

The following transactions all occurred in 1989. On March 15, Messagephone created the MPI Pass–Through Annuity Collateral Trust Agreement (the "Trust"), anticipating the Trust would own, administer, collect and maintain certain annuity contracts issued to Messagephone. The Trust was designed to hold annuities in an amount up to $410,000 for a term of five years. Joel Pugh and William Dean, officers and majority stockholders of the company, were named Trustees. On March 16, Messagephone purchased contract number 43 with a face value of $200,000 in exchange for 40,000 shares of stock (a value of $5 per share). On March 17, Messagephone purchased contract number 44 with a face value of $210,000 for 70,000 shares of its stock (the value had inexplicably diminished to $3 per share). American Equitable promised to pay twelve-percent interest semi-annually on the face value of both contracts for a term of five years. Both annuity contracts were assigned by Messagephone to the Trust on the day they were purchased.[2]

As soon as the annuities had been assigned to the Trust, Messagephone signed a series of non-recourse promissory notes, each called an "MPI Annuity Note," to various lenders. The terms of the notes mirrored the terms of the annuity contract: twelve-percent interest, payable semi-annually, for a term of five years, the principal due in full at maturity.

The lenders then assigned the notes to the Trust in exchange for an interest in the Trust based on the dollar amount of the notes. Thus, each note was secured by the American Equitable annuity contracts issued to Messagephone. Each was a non-recourse note: the lender agreed to look only to the annuities or the Trust rather than to Messagephone. Curiously each note also provided that in the event of American Equitable's default on the payments, the lender might look to the "Insurance Fund" of the State of Texas, presumably a reference to the Guaranty Association.[3] Messagephone then borrowed the following sums, executing "annuity notes":

| Date | Amount | Lender · |
|------|--------|----------|
| March 21 | $ 25,000 | First Interstate Bank |
| April 7 | 100,000 | BNA Partners |
| April 19 | 45,000 | BNA Partners |
| April 28 | 55,000 | BNA Partners |
| May 10 | 30,000 | BNA Partners |
| June 13 | 5,000 | BNA Partners |

On May 9, Messagephone purchased contract number 49 with a face value of $150,000 in exchange for 20,000 shares of its stock (a value of $7.50 per share). On June 22, Messagephone borrowed $150,000 from Donovan Campbell, M.D., issued him a promissory note with the same terms as the other non-recourse "annuity notes," and assigned to Campbell its rights and interest in contract number 49.[4] This financial transaction mirrored the earlier loans but assigned annuity number 49 directly to the lender rather than going through the Trust.[5]

The Department of Insurance noted American Equitable's financial difficulties as early as May 1989; it informed the company's management that the company was insolvent. The insurance company paid the first semi-annual interest payments on contracts 43 and

---

**2.** Although certain contracts purported to assign the annuities, the annuity contracts themselves provided: "Benefits payable under this contract may not be assigned, transferred or made subject to surrender, nor applied to the debts of another person in any manner, except as other wise provided in this contract or by law." We find nothing in any of the contracts which provides for the transfer or assignment of the contracts.

**3.** The notes also specifically stated that they were "insured under Chapter 3, Article 21.28–D, Section 5 of the Texas Insurance Code."

**4.** *See supra* note 2.

**5.** While the record reveals that before the annuity was assigned to Campbell American Equitable represented to the Texas Department of Insurance that it had actually rescinded and voided any annuity issued on that particular contract form, Campbell declared he had no knowledge that contract 49 was void or had been rescinded.

44 in September 1989. American Equitable was placed in receivership in November 1989, and no further payments were made on any of the three contracts. In June 1990, Messagephone filed a proof of claim for all three annuity contracts in the receivership proceeding. The company indicated on its application that it alone had an interest in the claim and was not assigning the benefits to any other. Although the Trust and Campbell never filed a proof of claim, both declare they authorized Messagephone to file claims on their behalf. In November 1992, the Association elected to take over the handling of all claims in the American Equitable proceeding; in July 1994, the Association denied coverage on the three claims asserted by Messagephone.

Shortly thereafter, Messagephone filed suit against the receiver and the Association; both Messagephone and the Association filed motions for summary judgment. The Association relied on affirmative defenses, specifically that the claims were excluded under sections (8) and (9) of article 21.28–D, section 3(c) of the Insurance Code.[6] Tex. Ins.Code Ann. art. 21.28–D, § 3(c)(8),(9) (West 1981 & Supp.1998). Due to the complex nature of the proceedings, the trial court appointed a special master. The master reviewed the transactions at issue and recommended granting summary judgment in favor of the Association. After severing the suit against the receiver, the trial court granted the Association's motion for summary judgment and denied Messagephone's. The court did not state the grounds upon which it made its ruling. In two points of error, appellants claim the trial court erred in granting summary judgment in favor of the Association and denying appellants' motion.

## STANDARD OF REVIEW

■ Generally upon review of a summary judgment, a court determines whether the movant has shown that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985). Here both parties agree this case is appropriately decided by summary judgment. When both parties move for summary judgment and the trial court grants one motion and denies the other the appellate court should determine all questions presented. *See Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). In the instant case, the only question presented is one of law: whether the appellants' claims regarding the three contracts are covered under the Guaranty Act. When reviewing a summary judgment granted on general or unstated grounds, we consider whether any theories set forth in the motion will support the summary judgment. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993). Thus, if any of the grounds presented by the Association are meritorious, we must affirm the trial court's summary judgment.

## DISCUSSION

As grounds for summary judgment, the Association asserted that Messagephone's claims were excluded from coverage under sections (8) and (9) of article 21.28–D, section (3)(c) of the Insurance Code. Tex. Ins.Code Ann. art. 21.28–D, § 3(c)(8), (9) (West 1981 & Supp.1998) (the "1991 Act"). Although the 1991 Act did not become effective until January 1, 1992, it states that the Association "may elect to assume its responsibilities under this Act in proceedings initiated before January 1, 1992." Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 1.27(b), 1991 Tex. Gen. Laws 252, 310. The Association made this election.[7] It now asserts that Message-

---

6. The Association also stated grounds for summary judgment on the basis that (1) the Trust and Campbell failed to file a statutorily required proof of claim; (2) Messagephone lacked standing to sue; (3) contract number 49 was void or rescinded by American Equitable; (4) no consideration was exchanged between MPI and American Equitable because the shares were worthless; and (5) several other grounds.

7. On appeal, appellants now claim that the Association did not make this election. However, the Association specifically alleged in a filed response that it had elected in the receivership proceeding to assume its responsibilities under the 1991 Act. Appellants never objected to this statement of fact; rather they objected to an interpretation of the Act that would allow the Association to make such an election. "Issues not expressly presented to the trial court by writ-

phone's claims are not covered under section (8) of the 1991 Act. Appellants concede that their claims are not compensable under section (8) but vigorously deny that the 1991 Act authorizes the Association to elect to apply the later statute to proceedings initiated before the 1991 Act's effective date. Appellants argue the election provision is unenforceable as an *ex post facto* law.

The Association also relies on section (9) of the 1991 Act to deny coverage of Messagephone's claims. *See* Tex. Ins.Code Ann. art. 21.28–D, § 3(c)(9). A verbatim version of this section was found in section 3(2)(k) of the 1987 Act. If Messagephone's claims are excluded under this section of the 1987 Act, we must affirm the summary judgment. If not, we must consider whether the Association could elect to apply the 1991 Act to these claims. Therefore we will first examine whether the Messagephone claims are compensable under the 1987 Act.

### THE 1987 ACT

■ Appellants contend that the three contracts are covered by the 1987 Act because it applies to unallocated annuity contracts which include guaranteed interest contracts. *See* Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 38, 3(1)(a), § 39(14), 1987 Tex. Gen. Laws 3610, 3661, 3663. Although the Act covers some unallocated annuity contracts it excludes others: "This Act shall apply: (a) to direct life insurance policies, ... annuity contracts *including unallocated annuity contracts except those specifically excluded in this Act ....*" *Id.* § 38, 3(1)(a) at 3661 (emphasis in the original). The issue then, is whether these three unallocated annuity contracts were specifically excluded by section 3(2)(k) which states:

> Any portion of a financial guarantee, funding agreement, or guaranteed investment contract which (1) contains no mortality guarantees and (2) is not issued to or in connection with a specific employee benefit plan or governmental lottery.

*Id.* § 38, 3(2)(k) at 3662. The Association claims the three contracts are guaranteed investment contracts which contain no mortality guarantees and were not issued to or in connection with an employee benefit plan. In making our determination, we note the paucity of Texas law addressing our concern here. Therefore, we must look to other jurisdictions and authorities regarding the meaning and use of the words we are charged with interpreting.

### A. Guaranteed Investment Contract (GIC)

■ Appellants argue the three contracts are "guaranteed interest contracts" or GICs rather than "guaranteed investment contracts" which are excluded by the statute. Because the Legislature neglected to define guaranteed investment contract, we rely on its common usage. We find that the financial world and the insurance industry use the term guaranteed investment contract interchangeably with guaranteed interest contract and, in fact, refer to each as a "GIC." *E.g.* Richard G. Mandel, Practicing Law Institute, Insurance Industry Perspective: Guaranteed Interest Contracts 111 (1991); Jonathan L. Mercier and A. Richard Susko, Practicing Law Institute, Guaranteed Investment Contracts 291 (1981). While a number of early GICs were actually called guaranteed interest contracts, over time the term guaranteed investment contract has become more commonly used. *See* Hubert V. Forcier, Practicing Law Institute, A GIC Primer: Terminology, Contract Provisions, How GICs are Used by Plan Sponsors and Competing Products 17 (1991) (called "guaranteed interest contract" because insurance companies were actually guaranteeing interest at market rate). However, the term GIC may still refer to *either* a guaranteed interest contract or a guaranteed investment contract. *See Unisys Corp. v. Penn. Life & Health Ins. Guar. Ass'n.*, 667 A.2d 1199, 1202 n. 7 (Pa. Commw.Ct.1995) (term "GIC" is acronym for "guaranteed investment contract" or "guaranteed interest contract"), *aff'd*, 546 Pa. 256, 684 A.2d 546 (1996); *see also In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 426 (3d Cir.) (referring to guaranteed investment

ten motion, answer or other response shall not be considered on appeal as grounds for rever-

sal." Tex.R. Civ. P. 166a(c).

contract as "GIC"), *cert. denied,* ─── U.S. ───, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996); *Bennet v. Virginia Life, Accident & Sickness Ins. Guar. Ass'n,* 251 Va. 382, 468 S.E.2d 910 (1996) (referring throughout to guaranteed interest contract as a "GIC."); Mandel, *supra,* at 111. Thus, the distinction between the two terms is merely semantic. Although the Legislature used the term guaranteed interest contract in one section in the 1987 Act and guaranteed investment contract in another,[8] we find the two terms are indistinguishable as commonly used by the financial world, the insurance industry, and the judiciary. We henceforth refer to either as a GIC.[9] Furthermore, a review of the nature and function of a GIC and these contracts demonstrates that the contracts at issue are excluded under section 3(2)(k) whether appellants refer to them as GICs or guaranteed interest contracts or guaranteed investment contracts.

Typically, a GIC promises a predetermined return on the principal or contract deposit and is usually issued for a fixed term of three to five years.[10] "GICs are contracts issued by an insurer which, under certain conditions, guarantee the return of principal, together with interest at a fixed or specified minimum rate, on a stated maturity date." Mercier and Susko, *supra,* at 291; *see also* "Interest Crediting" in Walker, Guaranteed Investment Contracts Risk Analysis and Portfolio Strategies, 95 (Dow Jones—Irwin, Homewood, Illinois 1989). The investment portion of a GIC, with a guaranteed interest for a fixed term, contains no insurance features. However, a GIC contains a provision permitting the contract holder to apply accumulated funds toward the purchase of an annuity for individual participants. Forcier, *supra,* at 30. "The guaranteed investment contracts, generally speaking, are deferred annuities under which the insurance company (in return for lump sum or installment premium payments) promises to pay interest at a guaranteed rate for the life of the contract

and, in addition, allow the insured to buy an annuity with the monies accumulated under the contract." Harold S. Bloomenthal, 3 Sec. & Fed. Corp. Law § 2.10 (1991–97). A GIC also typically includes a non-transferability clause due to the insurance industry's fear that such contracts would not be exempt from securities laws and that "book value" accounting would be lost if the contracts were transferable. Forcier, *supra,* at 27.

In exchange for the three unallocated annuity contracts with a combined face value of $560,000 Messagephone gave American Equitable an aggregate 130,000 shares of company stock. Part I of the contracts at issue indicates the face value of the investment, provides for a guaranteed contract interest rate of twelve-percent payable semi-annually for five years, and promises the initial investment will be returned in full at the end of the contract. These terms are the very essence of a GIC. *See In re Unisys Sav. Plan Litigation,* 74 F.3d at 426 ("A GIC is a contract under which the issuer is obligated to repay the principal deposit at a designated future date and to pay interest at a specified rate over the duration of the contract."); *Ferry v. Mutual Life Ins. Co. of New York,* 868 F.Supp. 764, 767 n. 3 (W.D.Penn.1994); "Taking Out the 'Guarantee' In the GIC Name," Pensions and Investments, June 10, 1991 at 12 (GIC is a contract between an insurance company and an investor by which the insurance company promises a certain fixed rate of return for a certain period); *see generally* Patricia O. McLaughlin, The American Law Institute, Guaranteed Investment Contracts and Beyond: Investing in and Diversifying out of Insurance Company General Accounts 145 (1991). Part II of the contracts contains the option for the contract holder to apply all or a portion of the accumulated funds toward the purchase of an annuity for eligible individuals. Part III includes a provision barring the assignment or transfer of

8. *See* Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 38, 3(1)(a), (2)(k) § 39(14), 1987 Tex. Gen. Laws 3610, 3661–663.

9. These type of investment contracts issued to pension plan managers are also very recently

called "GACs" (group annuity contracts) and "GIAs" (guaranteed interest accounts).

10. The investment is not "guaranteed" by a party other than the issuing insurance company, but the rate of return is fixed or guaranteed.

benefits payable under the contracts.[11]

The present contracts contain the guaranteed payment features of a guaranteed investment contract along with the annuity option and non-transferability clause common to GICs. Based on the foregoing discussion, we hold that contracts 43, 44 and 49 are GICs. As previously stated, we find that the commonly-used acronym GIC refers to either a guaranteed investment contract or a guaranteed interest contract and thus, the three GICs at issue are "guaranteed investment contract[s]" under the 1987 Act.

### B. Specific Employee Benefit Plan

Next we determine whether the contracts were issued to or in connection with a specific employee benefit plan. We first note that the contracts themselves indicate they were issued *only* to Messagephone, a corporation. Nowhere on the face of any of the three contracts is an employee benefit plan mentioned. Furthermore, appellants' discovery responses support this contention:

> REQUEST FOR ADMISSION NO. 7: The contracts are not issued to or in connection with a specific employee benefit plan, or government lottery.
>
> RESPONSE: Admit

For purposes of this analysis we conclude that the contracts were not issued to or in connection with a specific employee benefit plan.

### C. Mortality Guarantees

Finally we must determine whether the three contracts contain any mortality guarantees. A traditional individual annuity contains a mortality guarantee or risk because it is the mirror image of a life insurance policy. *See American Deposit Corp. v. Schacht,* 84 F.3d 834, 840 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996); *Variable Annuity Life Ins. Co. v. Clarke,* 998 F.2d 1295, 1301 (5th Cir.1993), *rev'd on other grounds,* 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995). With life insurance, the issuing company gambles that the insured will live longer than predicted; with a lifetime annuity, the issuing company

gambles that the annuitant will not reach her life expectancy. *See id.* Both life insurance and annuities are formulated on the basis of actuarial calculations of mortality risk. *Variable Annuity Life Ins. Co.,* 998 F.2d at 1301. The issuer of a traditional annuity assumes a mortality risk the moment the contract is issued. "That risk is an actuarial prognostication that a certain number of annuitants will survive to specific ages." *American Deposit Corp.,* 84 F.3d at 841.

By contrast the investment portion of a GIC in no way involves a mortality risk. To incorporate the business of insurance into this type of investment vehicle, typically GICs include the option for the contract holder to apply some portion of the accumulated funds towards the purchase of a traditional annuity "for eligible individuals." The insurance company's obligation to issue an annuity is real when the contract holder is the manager of an employee benefit plan: individuals will become eligible to withdraw benefits under the plan due to retirement or termination. Because the insurance company is obligated to issue a traditional annuity to such eligible individuals it assumes a mortality risk when it issues a GIC with this annuity option provision to the manager of a benefit plan. But did American Equitable assume any mortality risk when it issued these contracts with this option to Messagephone, a corporation? We hold that it did not.

When an insurance company issues the same investment vehicle to a corporation there are no "eligible individuals" to exercise the option to purchase an annuity. The option to purchase an annuity becomes meaningless. The insurance company assumes no mortality risk that a corporate entity will survive to a certain age based on its gender. Likewise no mortality risk is created by reproducing a mortality table in the contract: An actuarial prognosis of survival must refer to some individual. Simply adding a mortality table and an option to purchase an annuity to an investment contract does not create a mortality risk. If it did, any number of

---

11. *See supra* note 2. Having found no contractual provision that would have allowed Messagephone to transfer or assign these contracts to a

third party, we treat Messagephone as the contract holder for purposes of our analysis.

purely financial investments could be transformed into the business of insurance simply by inserting a mortality table and an annuity option. Under appellants' theory, the Association would then be responsible for every investment that contained these two boilerplate provisions. The context of these transactions reflects that these contracts were purchased solely to collateralize commercial financial transactions—as such they are investment contracts that do not contemplate any individual annuitant and are not burdened by any mortality risk.

On motion for rehearing, Messagephone complains that we have collapsed the two prongs of section 3(2)(k) into a single test—was the contract issued to an employee benefit plan? Because GICs arose as investment vehicles for employee benefit plans, providing the option to purchase an annuity for an eligible plan participant clearly creates a mortality risk in that context. We do not hold that a benefit plan is the only conceivable context in which the insurance company may assume a mortality risk when it issues a GIC. We do hold that American Equitable did not assume any mortality risk here when the contract holder was a corporate entity and there were no eligible individuals to exercise the option of purchasing an annuity. Nor did the mere inclusion of a mortality table in the contract create a mortality risk.

■ The Guaranty Act was enacted to cover specific types of insurance contracts. The Act indicates that the Legislature was capable of drawing stark lines as to which claims are compensable. The Act does not attempt to provide full coverage for the contractual obligations of all impaired insurers. The Legislature explicitly excluded several types of contracts and specifically limited the amount of coverage for included policies. *See* Tex. Ins.Code Ann. art. 21.28–D, §§ 3(2), 5(4). A guaranteed investment contract that contains a mortality risk by contemplating some individual or one that is issued to a specific employee plan is covered under the 1987 Act. However, the Legislature made clear its intention not to cover an investment contract that is not issued to an employee benefit plan when it does not incorporate as a real risk mortality guarantees to eligible individuals. We conclude as a matter of law that the three contracts at issue are guaranteed investment contracts (GICs) which do not contain mortality guarantees and are not issued to or in connection with a specific employee benefit plan; therefore, they are not covered under the 1987 Act. Because we hold section 3(2)(k) of the 1987 Act precludes coverage for these contracts, we need not address whether the Association could elect to apply the 1991 Act to these claims or any other grounds for summary judgment asserted by appellee. We overrule appellants' two points of error.

## CONCLUSION

Because we hold contracts numbered 43, 44 and 49 are excluded from coverage under the 1987 Act as a matter of law, we affirm the judgment of the trial court granting the Association summary judgment and denying appellants' motion for summary judgment.