DYNAMIC SYSTEMS, INC., Plaintiff-Appellant and Defendant-Appellant, v. MARK BOOZELL, Director of Insurance, The Department of Insurance *et al.*, Defendants (Illinois Life and Health Insurance Guaranty Association, Defendant-Appellee and Plaintiff-Appellee).

Fourth District   No. 4—97—0538

Argued April 16, 1998.—Opinion filed March 21, 2000.

Harvey M. Stephens (argued), of Brown, Hay & Stephens, of Springfield, and Carol Connor Flowe, of Arent, Fox, Kintner, Plotkin & Kahn, of Washington, D.C., for appellant.

Wm. Carlisle Herbert (argued), Robert C. Feldmeier, and Bradford J. Axel, all of Hopkins & Sutter, of Chicago, for appellee.

JUSTICE COOK delivered the opinion of the court:

■ This appeal involves application of the Illinois Life and Health Insurance Guaranty Association Law (Guaranty Law) (215 ILCS 5/531.01 *et seq.* (West 1992)). The Guaranty Law is based on the Life and Health Insurance Guaranty Association Model Act (Model Act) and its amendments (Nat'l Ass'n of Insurance Commissioners (hereinafter NAIC) Life and Health Insurance Guaranty Ass'n Model Act (Model Regulation Serv., July 1988)). The purpose of the Guaranty Law is:

> "to protect, subject to certain limitations, [specified persons] against failure in the performance of contractual obligations, under [specified] life or health insurance policies, annuity contracts and health or medical care service contracts *** due to the impairment or insolvency of the insurer issuing such policies or contracts." 215 ILCS 5/531.02 (West 1992).

The Illinois Life and Health Insurance Guaranty Association (Guaranty Association or Association) was created to effectuate the purpose of the Guaranty Law. 215 ILCS 5/531.02, 531.06 (West 1992).

The Guaranty Association is comprised of insurers who transact business in Illinois; and to have the authority to transact insurance in Illinois, they must remain members of the Association. 215 ILCS 5/531.06 (West 1992). One of the duties of the Association is to "[a]ssure payment of the contractual obligations" of an insolvent insurer "to covered persons." 215 ILCS 5/531.08(2)(a)(ii) (West 1992). The Guaranty Association provides the funds to cover the contractual obligations of insolvent insurers by assessing its member insurers. 215 ILCS 5/531.09(1) (West 1992). Those assessments are passed on to individual policyholders as "each policyholder, through a slightly increased cost, purchases protection for himself against the insolvency of his insurer." Proceedings of the Nat'l Ass'n of Insurance Commissioners, 1971 (Conclusions of the Subcommittee to Study Life and Disability Insurance Insolvencies and Prepare Any Necessary Legislation) (available at 1971—1 NAIC Proc. LEXIS 157, *158 (in record provided by parties)).

The Guaranty Law provides which persons and what policies or contracts are covered. The Guaranty Law provides coverage for specified policies and contracts:

> "(b) to persons who are owners of or certificateholders under such policies or contracts; or, in the case of unallocated annuity contracts, to the persons who are the contract holders, and who
>
> (i) are residents of this State, or
>
> (ii) are not residents, but only under all of the following conditions:
>
> (A) the insurers which issued such policies or contracts are domiciled in this State;
>
> (B) such insurers never held a license or certificate of authority in the states in which such persons reside;
>
> (C) such states have associations similar to the association created by this Act; and
>
> (D) such persons are not eligible for coverage by such associations." 215 ILCS 5/531.03(1)(b) (West 1992).

Thus, the protection afforded by the Guaranty Law is "primarily extended to resident persons but certain nonresidents *under specific circumstances* will be protected by this Act [(the Model Act)] if the insolvent insurer was domiciled in [Illinois]." (Emphasis added.) Proceedings of the Nat'l Ass'n of Insurance Commissioners, 1986 (Official Comment to section 3: Coverage and Limitations of the Life and Health Insurance Guaranty Ass'n Model Act) (available at 1986—1 NAIC Proc. LEXIS 293, *307 (in record provided by parties)). The State of Illinois is legitimately concerned with making benefits available to nonresidents when those benefits are derived from assess-

ments on Illinois residents and through regulations imposed on Illinois insurers that other states choose not to impose.

■ Section 531.03 of the Guaranty Law provides for coverage for the "contractholders" of "unallocated annuity contracts." 215 ILCS 5/531.03(1)(b), (2)(a)(iii) (West 1992). An "unallocated annuity contract" is defined as follows:

> "any annuity contract or group annuity certificate which is not issued to and owned by an individual, except to the extent of any annuity benefits guaranteed to an individual by an insurer under such contract or certificate." 215 ILCS 5/531.05(15) (West 1992) (added by Pub. Act 86—753, § 1, eff. January 1, 1990) (1989 Ill. Laws 3989, 4015)).

The Guaranty Association's liability to "any one contract holder covered by any unallocated annuity contract" does not exceed $5 million in benefits "irrespective of the number of such contracts held by that contractholder." 215 ILCS 5/531.03(3)(b)(iii) (West 1992).

Dynamic Systems, Inc. (DSI), is a Maryland corporation headquartered in Alexandria, Virginia. DSI sponsored the DSI Savings Enhancement Plan (Plan), a 401k plan, for its eligible employees. The Plan is participant-directed in that each employee who contributes to the Plan has the "right to direct the investment" of his contributions "among the investment funds authorized by the Plan committee." The Plan's assets are held in a trust (Trust) and are invested by the trustees. Plan participants receive benefits upon termination of their employment, retirement, or permanent disability by way of an annuity purchased on behalf of the employee, among other alternatives.

DSI Plan participants directed that some part of their contributions be invested in an option offered by Inter-American Life Insurance Company of Illinois (Inter-American). The trustees used these contributions to purchase three "window guaranteed investment contracts" (Contracts) from Inter-American. The "contractholder" of the Contracts was defined by the Contracts as the "qualified employee benefit plan and trust to which this Contract is issued." The Plan and Trust are the sole owners of the Contracts.

The Trust could withdraw amounts that accrued under the Contracts to provide Plan benefits to participants. The Contracts provided that "[u]pon receipt of a notice from the [c]ontractholder to purchase an annuity under this Contract for a person in accordance with the Plan, [Inter-American] will effect the purchase of such annuity."

On December 23, 1991, Inter-American was placed under an order of liquidation by the Cook County circuit court due to its insolvency. The value accumulated under the Contracts exceeded $1.6 million. At that time, the Trust's two trustees both resided in Virginia.

As a result of Inter-American's insolvency, the Plan sought coverage for the Contracts under our Guaranty Law. On May 28, 1992, DSI filed a claim with the Guaranty Association on behalf of the Plan participants, none of whom were Illinois residents. On March 15, 1993, the Guaranty Association denied DSI's claim for coverage under the Guaranty Law. The Guaranty Association concluded the Contracts were "unallocated annuity contracts" because the Contracts were issued by Inter-American to the Trust as "contractholder." Since the Trust was a resident of Virginia for purposes of the Guaranty Law and because Inter-American was licensed in Virginia, the Trust was not covered under the Guaranty Law's nonresident provisions. 215 ILCS 5/531.03(1)(b)(ii)(B) (West 1992).

DSI appealed the Guaranty Association's decision to the Illinois Director of Insurance (Director) (215 ILCS 5/531.11(3) (West 1992)), contending that the Plan participants were covered by the Guaranty Law. DSI argued the Contracts were *not* "unallocated annuity contracts," that instead they were "allocated" annuity contracts since each Plan participant was guaranteed a benefit under the terms of the Contracts. DSI also argued that the Plan participants were owners under the Contracts.

The Director issued an order on September 29, 1995, reversing in part the Guaranty Association's decision. The Director rejected the Guaranty Association's conclusion that the Contracts were "unallocated annuity contracts." The Director found the Contracts were "allocated" annuity contracts even though they were owned by and issued to the Plan and Trust, and the Plan and Trust were named the "contractholder." The Director concluded as follows:

> "Looking at the contracts, the Trust and the Plan itself, it is clear that the contracts contemplated the beneficiary status of the individual participants of the Plan, and although the contractual relationship legally exists between the insurance [c]ompany and the Trustee, the contracts themselves acknowledge the beneficiaries' ownership and the guaranteed benefits provided thereby. Pursuant to the definition of 'unallocated annuity contracts' as provided in section 531.05(15), the contracts owned by the Trust guarantee annuity benefits to individual participants, under the Plan."

The Director also concluded that the Plan participants were "nonresident certificate holders under group contracts," but subsequently abandoned that conclusion as unsupported in an amended order.

The Director concluded that whether a Plan participant was covered by the Guaranty Law depended on where the individual Plan participant resided. Because the Director found that the Contracts were "allocated" annuity contracts, as well as the fact that Inter-

American was not licensed to do business in Maryland, he ruled that the 12 Plan participants who were residents of Maryland and had investments under the Contracts were covered under the Guaranty Law. The Director ordered the Guaranty Association to provide coverage for those 12 individuals. The Director affirmed the Guaranty Association's denial of coverage for participants who were residents of Virginia or other states where Inter-American held licenses or certificates of authority.

DSI sought administrative review of the Director's decision insofar as it denied coverage (Sangamon County case No. 95—MR—311); the Guaranty Association filed a separate petition for review of the Director's decision insofar as it required it to cover the 12 Maryland Plan participants (Cook County case No. 95—CH—10657). By order of the Cook County circuit court, that court transferred its chancery case to Sangamon County and, by agreement of the parties, the cases were consolidated for consideration by the court.

On May 27, 1997, the circuit court of Sangamon County affirmed the Director in the DSI-initiated case, No. 95—MR—311, and reversed the Director in the Guaranty Association-initiated case, No. 95—CH—10657. Citing the Virginia Supreme Court case *Bennet v. Virginia Life, Accident & Sickness Insurance Guaranty Ass'n*, 251 Va. 382, 468 S.E.2d 910 (1996), the circuit court concluded that Guaranty Law coverage was not available for the Contracts with respect to the 12 Maryland Plan participants because "as a matter of law *** the contracts in question were unallocated annuity contracts."

On appeal, DSI argues that the circuit court erred in reversing the Director's order and concluding the Contracts were "unallocated annuity contracts." DSI contends that the Contracts are "allocated" annuity contracts and that the 12 Maryland Plan participants are covered under the Guaranty Law.

The Director is not a party to this appeal. Since he issued his order in this case, the Director moved voluntarily to dismiss his appeal, which was granted and leaves DSI alone to contest the judgment of the circuit court. Furthermore, in his subsequent decisions, the Director has abandoned the position he took in deciding this case. In fact, in an action regarding other contracts issued by Inter-American, the Director determined the contracts were "unallocated annuity contracts," concluding no contract was issued to and owned by an individual plan participant and that Inter-American promised no annuity benefits to an individual until an actual annuity was issued to an individual participant. See *In re Life & Health Insurance Guaranty Ass'n Claim Beaven Cos.*, Ill. Dept. of Ins. Hearing No. 3445 (October 21, 1997) (Director's order). The Director has also rejected a retire-

ment plan's "beneficial ownership" argument subsequent to his decision in this case. See *In re the Life & Health Insurance Guaranty Ass'n Denial of Claim of Unisys Corp. & Corestates Bank, N.A., as Trustee for Unisys Savings Thrift Trust on Executive Life Policy Nos. CG01238A3A, CG01238B3A, CG0126703A, CG01279A3A*, Ill. Dept. of Ins. Hearing No. 3473 (November 25, 1997) (Director's order).

In this case, no factual dispute exists, as the only contention on appeal is whether the Contracts are "unallocated annuity contracts" under the Guaranty Law. Because a question of law is before us, the standard of review is *de novo. Illinois Life & Health Insurance Guaranty Ass'n v. Boozell*, 289 Ill. App. 3d 621, 628, 682 N.E.2d 291, 296 (1997).

Simply stated, we must determine whether the Contracts are owned by the Plan and Trust, making them "unallocated annuity contracts," or whether the Contracts are owned by the individual Plan participants, making the Contracts "allocated" annuity contracts. Whether the Contracts are "allocated" or "unallocated" determines how the nonresident coverage provision of section 531.03(b) is applied and whether the Guaranty Association must cover the 12 Maryland Plan participants. If the Contracts are "unallocated," then we look to the state where the Plan and Trust reside, Virginia, to determine if the section 531.03(b) requirements have been met. If the Contracts are "allocated," we look to the state where the individual Plan participants reside, Maryland, to determine if those individuals meet the section 531.03(b) nonresident requirements.

We note the decision of the Virginia Supreme Court in *Bennet*, 251 Va. 382, 468 S.E.2d 910. In that case, DSI sought coverage under Virginia's guaranty law for the same Contracts at issue in this case. The Virginia Supreme Court essentially held that the Contracts were unallocated annuity contracts. *Bennet*, 251 Va. at 386-88, 468 S.E.2d at 913-14. Unlike the Guaranty Law, the Virginia law provides no coverage for unallocated annuity contracts. *Bennet*, 251 Va. at 386, 468 S.E.2d at 913, citing Va. Code Ann. § 38.2—1700(C)(5) (Michie 1994).

DSI offers several arguments why the Contracts should be considered "allocated" annuity contracts. First, DSI contends that although the Contracts designated the Trust as the legal "owner" of the Contracts, the Plan participants were equitable and beneficial owners under the Contracts, thereby making them allocated annuity contracts. In support of its proposition, DSI notes several significant indicia of participant ownership: the trustees administered the Plan for the exclusive benefit of the participants; the participants decided when and how to direct the investment of their funds; and an annuity could be purchased on behalf of an individual participant.

■ An "unallocated annuity contract" is "any annuity contract or group annuity certificate which is not issued to *and* owned by an individual." (Emphasis added.) 215 ILCS 5/531.05(15) (West 1992). So, for an annuity contract to be "allocated," it must be both issu_d to *and* owned by an individual. *Bennet*, 251 Va. at 386, 468 S.E.2d at 913; *Unisys Corp. v. Texas Life, Accident, Health & Hospital Service Insurance Guaranty Ass'n*, 943 S.W.2d 133, 138 (Tex. Ct. App. 1997). Here, according to the terms of the Contracts, they were issued to the "contractholder," which was the Plan and Trust. No contract or policy was issued to an individual participant until the Plan directed Inter-American to purchase an annuity for an individual participant to provide benefits under the Plan. The Contracts were not issued to an individual. We also conclude that the Contracts were not owned by an individual. The Contracts provided the "contractholder" was the sole owner.

We also reject DSI's equitable ownership argument. In *Bennet*, DSI advanced its equitable ownership argument when it sought coverage for these Contracts under Virginia's guaranty laws. *Bennet*, 251 Va. at 386, 468 S.E.2d at 913. Interpreting the opening provision of Virginia's guaranty law, which excluded unallocated annuity contracts from its scope in language similar to that of the Illinois definitional provision ("[a]ny contract or certificate which is not issued to and owned by an individual, except to the extent of *** any annuity benefits guaranteed to an individual by an insurer under such contract or certificate" (Va. Code Ann. § 38.2—1700(C)(5) (Michie 1994); 215 ILCS 5/531.05(15) (West 1992))), the Virginia Supreme Court concluded that nothing in the statutory language permits an interpretation that mere beneficial or. equitable ownership could satisfy the "issued to" and "owned by" requirements. *Bennet*, 251 Va. at 386, 468 S.E.2d at 913. Similarly, in *Unisys Corp.*, the Texas appellate court rejected an equitable ownership argument made under Texas' "unallocated annuity contract" definitional provision, which also contained language nearly identical to that of the Illinois provision (compare Tex. Ins. Code Ann. art. 21.28—D, § 5(14) (West Supp. 2000), with 215 ILCS 5/531.05(15) (West 1992)), concluding that the Texas guaranty act contemplated only legal ownership. *Unisys Corp.*, 943 S.W.2d at 139. The guaranteed interest or investment contracts, often referred to as GICs, at issue in *Unisys Corp.* were contracts strictly between the insurance company and the plans' trustees, and individual participants did not " 'own' or 'hold' contracts over which they have no control and in which they are allocated no benefits until they have elected to create individual contracts with the [insurance company] via the bank trustee." *Unisys Corp.*, 943 S.W.2d at 140; accord *Unisys*

*Corp. v. Commissioner of Insurance*, 236 Mich. App. 686, 693, 601 N.W.2d 155, 159 (1999); but see *Arizona Life & Disability Insurance Guaranty Fund v. Honeywell, Inc.*, 190 Ariz. 84, 95, 945 P.2d 805, 816 (1997) (Arizona resident plan participants were equitable owners of the GICs). Likewise, the Illinois Director of Insurance, subsequent to his order in this case, has rejected the beneficial ownership argument and maintained that no evidence shows that the legislature ever intended beneficial ownership to control when determining what constitutes an "unallocated annuity contract." See *In re the Life & Health Insurance Guaranty Ass'n Denial of Claim of Unisys Corp. & Core-States Bank, N.A., as Trustee for Unisys Savings Thrift Trust on Executive Life Policy Nos. CG01238A3A, CG01238B3A, CG0126703A, CG01279A3A*, Ill. Dept. of Ins. Hearing No. 3473 (November 25, 1997) (Director's order).

We agree that beneficial and equitable ownership is not enough to satisfy the "issued to" and "owned by" requirements under the Guaranty Law. The individual Plan participants had no control over the Contracts. The Trustees conducted all financial transactions between the Plan and Inter-American. The Plan and Trust were specifically issued the Contracts and were named as the contractholders and sole owners. No individual was specifically identified as an owner of a Contract, and nothing in the language of the statute indicates equitable ownership alone satisfies its standards. Not until an annuity was purchased on behalf of an individual participant did an individual become an owner of a contract.

DSI also contends that the Contracts are "allocated" annuity contracts because they fit within the exception clause of the "unallocated annuity contract" definition. An annuity contract is "allocated" if "any annuity benefits [are] guaranteed to an individual by an insurer under such contract or certificate." 215 ILCS 5/531.05(15) (West 1992). DSI contends that promotional booklets distributed to Plan participants, explaining the Plan's terms and the Inter-American option, should be considered part of the Contracts, and so statements made in the booklets should be read into and as part of the Contracts. See *Dobosz v. State Farm Fire & Casualty Co.*, 120 Ill. App. 3d 674, 679, 458 N.E.2d 611, 614 (1983) (descriptive booklets may be treated as part of an insurance contract). DSI's interest in having the booklets construed as part of the Contracts is that the language of the booklets, including such statements as "your account is 100% yours" and that Inter-American "guarantees your principal and the earnings on every dollar you invest," made the Contracts allocated annuity contracts. DSI reasons that these statements constituted "annuity benefits guaranteed to an individual by an insurer under such contract." 215 ILCS 5/531.05(15) (West 1992).

DSI argues that the booklets should be considered part of the Contracts since they contained statements of Inter-American. The Guaranty Association asserts that the booklets contain statements of DSI regarding the Plan, not statements of Inter-American, so that they cannot be made a part of the Contracts.

In his order, the Director made no finding regarding who drafted and distributed the booklets, nor did he find that the booklets were part of the Contracts. Although the booklets may not have been prepared by the Plan, no evidence shows they were prepared by Inter-American either. Even assuming Inter-American made the statements that it guaranteed the participants' principal and interest on their investments, those statements referred to market fluctuations under these "guaranteed investment contracts." Even if the statements contained guarantees, they were not guarantees of annuity benefits "to an individual."

Inter-American had no relationship with the individual Plan participants until and unless the Plan requested that Inter-American purchase an annuity on behalf of an individual Plan participant in order to provide benefits under the Plan. See *Unisys Corp.*, 943 S.W.2d at 138. "An undertaking to purchase an annuity in the future is not a present guarantee of annuity benefits." *Bennet*, 251 Va. at 388, 468 S.E.2d at 914; see also *Messagephone, Inc. v. Texas Life, Accident, Health & Hospital Service Insurance Guaranty Ass'n*, 966 S.W.2d 133, 137-38 (Tex. Ct. App. 1998) (discussing GICs). Furthermore, the provisions in the Contracts, and the booklet, are in general terms, they do not specifically identify any individual participants, nor do they identify a fixed sum or series of fixed sums payable to an individual participant. Not until an annuity is purchased on behalf of a specified individual are any annuity benefits guaranteed by an insurer. See, *e.g.*, *In re Life & Health Insurance Guaranty Ass'n Claim Beaven Cos.*, Ill. Dept. of Ins. Hearing No. 3445 (October 21, 1997) (Director's order). Promising Plan participants a general return on their investment does not rise to the level of a guaranty of annuity benefits as required by the statute because no amount is allocated to an individual Plan participant. See Proceedings of the Nat'l Ass'n of Insurance Commissioners, 1986 (Official Comment to section 3: Coverage and Limitations) (1986—1 NAIC Proc. LEXIS 293, *308 (in record provided by parties)).

Our decision is in line with the policy behind the Guaranty Law. The Guaranty Law limits Guaranty Association liability to $5 million in the case of "unallocated annuity contracts." 215 ILCS 5/531.03(3)(b)(iii) (West 1992). If contracts issued to employee benefit plans were treated as "allocated" annuity contracts, the Guaranty As-

sociation's liability could well exceed the $5 million limitation applicable to such contracts, something not contemplated by the Guaranty Law.

We hold that the Inter-American Contracts at issue are "unallocated annuity contracts." Coverage under the Guaranty Law is limited to the "contractholders" of "unallocated annuity contracts," and here the "contractholder," by the terms of the Contracts, was the Plan and Trust. At the time of Inter-American's insolvency, the two trustees resided in Virginia, making the Trust a resident of Virginia for purposes of the Guaranty Law. 215 ILCS 5/531.05(13) (West 1992); *Illinois Life & Health Insurance Guaranty Ass'n*, 289 Ill. App. 3d at 630-31, 682 N.E.2d at 298. Inter-American was also licensed in Virginia. Consequently, the 12 Maryland Plan participants are not covered by the nonresident provisions of the Guaranty Law of the State of Illinois. 215 ILCS 5/531.03(1)(b)(ii)(A) through (1)(b)(ii)(D) (West 1992).

We note that the 1970 Model Act provided coverage for all policyholders in the state where the insurer was incorporated ("domiciled"), no matter where the policyholders resided. A state in which policyholders resided did not cover those residents if the state where the insurer was incorporated provided the policyholders substantially similar protection. W. Dunham, & D. Kinney, *Life and Health Insurance Guaranty Associations*, in Insurance Company Insolvency 277, 282 (PLI Commercial Law & Prac. Course Handbook Series No. 580, (1991)) (hereinafter Dunham & Kinney). In a major insolvency, however, the state in which the insurer was incorporated may not have sufficient assessment capacity to meet its obligations.

For example, in 1983, life insurer subsidiaries of Baldwin-United Corporation, including National Investors Life Insurance Company (Arkansas) and University Life Insurance Company of America (Indiana), failed. These insurers had sold about $4 billion in single-premium deferred annuities to about 136,000 policyholders in 36 states, principally through securities brokers, and included interest rate guarantees higher than their competition. Dunham & Kinney at 277. Fewer than two-thirds of the states had then enacted state insolvency guaranty laws for life and health insurers, and those largely followed the Model Act. The Baldwin-United insolvency was handled via a multistate cooperative plan. The National Organization of Life and Health Insurance Guaranty Associations (NOLHGA) reported that its member associations had been assessed $63,350,159 for the Baldwin-United insolvency. Dunham & Kinney at 292-94.

The huge losses that would be imposed on the state in which an insolvent insurer was incorporated thus provided impetus for changes to the Model Act in 1985, including adoption of a "residents only" ap-

proach, whereunder each state association in which the insolvent insurer was a member had responsibility for covering policyowners resident in that state. Model Act § 5(j), Proceedings of the Nat'l Ass'n of Insurance Commissioners, December 1984 (available at 1985—1 NAIC Proc. LEXIS 107, *110 (in record provided by parties)); see also J. Blaine, *Organization and Capabilities of Life and Health Guaranty Associations in the United States*, in Law and Practice of Life Insurance Company Insolvency 6-4 (ABA Tort & Insurance Prac. Sec. Committee on Public Regulation of Insurance Law (ed. D. Spector 1993) (hereinafter Blaine). This "residents-only" approach spreads the loss among the states in which the insurer is licensed to do business. Blaine at 6-5.

In 1987, the Model Act was further revised, adding the definition of "unallocated insurance contracts," introducing a $5 million limit on liability to any one contractholder covered by any unallocated annuity contract irrespective of the number of contracts held by that contractholder (a nonstacking-type provision), and adding the following for coverage:

"This Act shall provide coverage to the persons specified in Subsection A for direct, nongroup life, health, annuity and supplemental policies or contracts, for certificates under direct group policies and contracts, and for unallocated annuity contracts issued by member insurers, except as limited by this Act. Annuity contracts and certificates under group annuity contracts include but are not limited to guaranteed investment contracts, deposit administration contracts, unallocated funding agreements, allocated funding agreements, structured settlement agreements, lottery contracts[,] and any immediate or deferred annuity contracts." Model Act § 3(B)(1) (Model Regulation Serv., July 1998).

In 1991, Executive life Insurance Company (ELIC) failed. Total guaranty association liabilities were said to be $2 billion, split roughly at $800 million in life insurance and $1.2 billion in annuities. ELIC's 1991 failure was followed by First Capital, Fidelity Bankers, Mutual Benefit Life, and others in that year. Blaine at 6-5. In December 1991, Inter-American was adjudicated insolvent in Cook County, Illinois, leading to the instant case.

The NAIC has adopted further amendments to the Model Act through the years. Likewise, the various states have enacted statutes creating insurance guaranty associations covering life and health insurance to fund, via involuntary assessment of licensed insurers, the continuation of coverage and payment of claims of policyholders for member insurers on insolvency. Most of these statutes are based in substantial part on the Model Act but not all states have enacted

substantially the current Model Act. Blane at 6-1. "The major coverage differences lie in the treatment of pension products between those states that cover unallocated annuities (guaranteed interest contracts and deposit administration contracts), and those that do not cover them either by specific exclusion or silence." Blaine at 6-8 to 6-9.

Numerous states have, for example, codified the 1987 revisions to the Model Act substantially, including Illinois (Pub. Act 86—753, § 1, eff. January 1, 1990 (1989 Ill. Laws 3989, 4011-24)). See also, e.g., Alaska Stat. §§ 21.79.010 through 21.79.990 (Lexis 1998); Ark. Code Ann. §§ 23—96—101 through 23—96—121 (Lexis Supp. 1999); Cal. Ins. Code §§ 1067 through 1067.18 (Deering Supp. 1999); Conn. Gen. Stat. Ann. §§ 38a—858 through 38a—875 (West 1992 & Supp. 1999); Del. Code Ann. tit. 18, §§ 4401 through 4419 (1989 & Supp. 1998); Haw. Rev. Stat. Ann. §§ 431:16—201 through 431:16—219 (Michie 1998); Kan. Stat. Ann. §§ 40—3001 through 40—3018 (1993 & Supp. 1998); Ky. Rev. Stat. Ann. §§ 304.42—010 through 304.42—190 (Banks-Baldwin 1995 & Supp. 1998); La. Rev. Stat. Ann. §§ 22:1395.1 through 22:1395.19 (West 1995 & Supp. 1999); Mich. Comp. Laws Ann. §§ 500.1701 through 500.7780 (West 1993 & Supp. 1999); Miss. Code Ann. §§ 83—23—201 through 83—23—235 (1999); Mo. Ann. Stat. §§ §§ 376.715 through 376.758 (West 1991 & Supp. 1999); Mont. Code Ann. §§ 33—10—201 through 33—10—230 (1999); N.J. Stat. Ann. §§ 17B:32A—1 through 17B:32A—19 (West 1996); N.C. Gen. Stat. §§ 58—62—2 through 58—62—95 (1994 & Supp. 1998); N.D. Cent. Code §§ 26.1—38.1—01 through 26.1—38.1—16 (Michie 1995 & Supp. 1999); Ohio Rev. Code Ann. §§ 3956.01 through 3956.20 (Anderson 1996 & Supp. 1998); Pa. Stat. Ann. tit. 40, §§ 991.1701 through 991.1718 (West Supp. 1999); S.D. Codified Laws §§ 58—29C—1 through 58—29C—43 (Michie 1996 & Lexis Supp. 1999); Tenn. Code Ann. §§ 56—12—118 through 56—12—220 (1994 & Supp. 1999); Tex. Ins. Code Ann. art. 21.28—D, §§ 1 through 21 (West Supp. 1999); Utah Code Ann. §§ 31A—28—101 through 31A—28—221 (1999); Vt. Stat. Ann. tit. 8, §§ 4151 through 4185 (1993 & Supp. 1999); Wash. Rev. Code Ann. §§ 48.32A.010 through 48.32A.931 (West 1999); W. Va. Code §§ 33—26A—1 through 33—26A—19 (Michie 1996). Numerous other states have adopted some variant thereof. See, e.g., Colo. Rev. Stat. Ann. §§ 10—20—101 through 10—20—117 (West Supp. 1999); D.C. Code Ann. §§ 35—1941 through 35—1956 (1997 & Lexis Supp. 1999); Fla. Stat. Ann. §§ 631.711 through 631.737 (West 1996 & Supp. 1999); Ga. Code Ann. §§ 33—38—1 through 33—38—22 (Michie 1996); Idaho Code §§ 41—4301 through 41—4319 (Michie 1998); Ind. Code Ann. §§ 27—8—8—1 through 27—8—8—18 (Michie 1994 & Lexis Supp. 1999); Iowa Code Ann. §§ 508C.1 through 508C.19 (West 1998 &

Supp. 1999); Me. Rev. Stat. Ann. tit. 24—A, §§ 4601 through 4619 (West 1990 & Supp. 1998); Md. Code Ann., Ins. §§ 9—401 through 9—419 (Michie 1997); Mass. Ann. Laws ch. 175 § 146B (Lexis-Nexis 1997); Minn. Stat. Ann. §§ 61B.18 through 61B.32 (West 1996 & Supp. 1999); Neb. Rev. Stat. Ann. §§ 44—2701 through 44—2720 (Michie 1995 & Lexis Supp. 1999); Nev. Rev. Stat. Ann. §§ 686C.010 through 686C.370 (Michie 1997); Okla. Stat. Ann. tit. 36, §§ 2021 through 2043 (West 1999); Or. Rev. Stat. §§ 734.750 through 734.890 (1995); R.I. Gen. Laws §§ 27—34.1—1 through 27—34.1—20 (1998); Wyo. Stat. Ann. §§ 26—42—101 through 26—42—118 (Lexis 1999).

The statutory schemes of other states, however, differ from these in varying degrees. New York, for example, whose legislature mandated the first association in 1941 (R. Lurie & D. Harris, *1991 Life and Health Insurer Solvency Legislation*, 20 Colo. Law. 1767, 1768 (1991)), has largely kept its own statutory scheme (N.Y. Ins. Law §§ 7501 through 7507, 7411, 7412 (McKinney 1985 & West Supp. 1999-2000)); Wisconsin, which enacted its scheme in 1977, has done the same (Wis. Stat. Ann. §§ 646.01 through 646.71, 645.86, 645.87 (West 1995 & Supp. 1999)). New Hampshire adopted an act consistent with the 1970 Model Act in 1971, which remains largely unchanged (N.H. Rev. Stat. Ann. §§ 404—D:1 through 404—D:18 (Lexis 1998)); New Mexico and South Carolina adopted acts that were variants of the 1970 Model Act, which likewise remain largely unchanged (N.M. Stat. Ann. §§ 59A—42—1 through 59A—42—16 (Michie 1995 Repl. & Supp. 1999) (enacted in 1984); S.C. Code Ann. §§ 38—29—10 through 38—29—200 (West Supp. 1999) (enacted in 1976)). Finally, several states that adopted acts based on the 1970 Model Act (Ala. Code §§ 27—44—1 through 27—44—21 (Lexis 1998) (enacted in 1982 and amended in 1993); Va. Code Ann. §§ 38.2—1700 through 38.2—1721 (Michie 1999) (enacted in 1976)), or a variant of it (Ariz. Rev. Stat. Ann. §§ 20—681 through 20—695 (West 1990 & Supp. 1999) (enacted in 1977 and amended in 1995 and 1998)), have amended them only to a limited extent.

Administrative problems can arise in determining residency of policyowners of, *e.g.*, structured settlement annuities which, for federal tax reasons, may be "owned by someone other than the annuity's payee, whereas the residence of the payee of these annuities seems more consistent with the revised Model Act's 'residents-only' coverage." Blane at 6-9; see also, *e.g.*, *Missouri Life & Health Insurance Guaranty Ass'n v. Cameron Mutual Insurance Co.*, 991 S.W.2d 676, 679 (Mo. App. 1999) (finding annuities purchased in fulfillment of agreements to settle tort claims to be within statutory exception affording coverage because allocated to benefit specific individuals, al-

though purchasing companies retained ownership for tax benefit of annuitants and payees; distinguishing GICs).

DSI's beneficial and equitable ownership analysis seeks to achieve a result that contradicts legislative efforts to address coverage issues for financial instruments now common in the marketplace.

The judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

GARMAN and KNECHT, JJ., concur.